IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

RACHEL CLAY,

       Plaintiff,

vs.

CREDIT BUREAU ENTERPRISES,
INC.,

       Defendant.

No. C11-2007

RULING ON MOTION FOR
SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

I.  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.  *Promotions Sought by Clay* . . . . . . . . . . . . . . . . . . . . . . . . 3
        1.  *Collection Trainer* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        2.  *Legal Collector* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        3.  *Front Line Supervisor* . . . . . . . . . . . . . . . . . . . . . . . . 4
        4.  *PPA Supervisor and PPA Team Lead* . . . . . . . . . . . . . . . 6
    B.  *Clay's Disciplinary History at CBE* . . . . . . . . . . . . . . . . . . . 7
        1.  *Coachings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        2.  *Verbal Warning* . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.  *LEGAL STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . 11

V.  *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    A.  *Are Clay's Claims Timely?* . . . . . . . . . . . . . . . . . . . . . . . . 12
    B.  *Did CBE Discriminate Against Clay Based on Her Race?* . . . . . . . 18
        1.  *Race Discrimination Based on Discipline* . . . . . . . . . . . . . 19
        2.  *Race Discrimination Based on a Failure to Promote* . . . . . . 22
        3.  *Race Discrimination Based on a Hostile Work
            Environment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    C.  *Clay's Retaliation Claim* . . . . . . . . . . . . . . . . . . . . . . . . . 29

      *D.    Clay's Constructive Discharge Claim*. . . . . . . . . . . . . . . . . . . . . 31

**VI.  CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**VII.  ORDER**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## I.  INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 17) filed by Defendant Credit Bureau Enterprises, Inc. on March 16, 2012; the Resistance (docket number 21) filed by Plaintiff Rachel Clay on April 20, 2012; and the Reply (docket number 28) filed by Defendant on May 7, 2012. Pursuant to Local Rule 7.c, the Motion for Summary Judgment will be decided without oral argument.

## II.  PROCEDURAL BACKGROUND

Plaintiff Rachel Clay ("Clay") timely filed charges of race discrimination in employment against Defendant Credit Bureau Enterprises, Inc. ("CBE") with the Iowa Civil Rights Commission ("ICRC"). The charges were also cross-filed with the Equal Employment Opportunity Commission ("EEOC"). On July 23, 2008, the ICRC administratively closed Clay's complaint, finding no probable cause warranting further investigation of her claims of discrimination. On September 23, 2008, the EEOC adopted the findings of the ICRC, and also administratively closed Clay's complaint.

On March 1, 2011, Clay filed a Complaint and Jury Demand (docket number 2) alleging race discrimination, harassment, hostile work environment, retaliation, and constructive discharge in violation of 42 U.S.C. § 1981 (Count I). On April 8, 2011, CBE filed an Answer and Defenses (docket number 5), generally denying the material allegations contained in the complaint, and asserting certain affirmative defenses. On May 6, 2011, both parties consented to proceed before a United States Magistrate Judge, pursuant to the provisions set forth in 28 U.S.C. § 636(c). Trial is scheduled before the undersigned on June 25, 2012. Defendant filed the instant Motion for Summary Judgment (docket number 17) on March 16, 2012.

## III. RELEVANT FACTS

CBE is an Iowa corporation with its home office in Cedar Falls, Iowa. CBE engages in the business of debt collection for various industries and organizations nationwide. In March 2005, Clay began employment with CBE as a Front Line Collector. She also held positions as a PPA Collector and Quality Control Specialist. In February 2008, Clay resigned from employment with CBE for "personal reasons."[1] During her employment, Clay sought several promotions which she did not get. Clay was also disciplined on various occasions during her employment at CBE.

### A. Promotions Sought by Clay

#### 1. Collection Trainer

On January 16, 2006, Clay applied for the position of Collection Trainer. Seventeen people applied for the position. Clay was not selected for a second interview. Kelli Krueger, manager of training and recruiting, explained to Clay:

> that the individuals that were selected to move to the next stage had more first line collection experience and were all currently in a leadership position (either a team lead or a manger) [sic]. The feedback I gave [Clay] for future interviews is to obtain more front line collection experience and strive to move into a leadership position starting with team lead. I also explained [to] her that if she is really interested in this position to be more clear on that during the initial interview. During this interview she did talk a lot about why she wanted 'out' of her current position but didn't talk about why this training position was what she really 'wanted' to do.

CBE's Appendix (docket number 17-4) at 116. Nate Sorenson was selected to fill the position of Collection Trainer. In answers to questions from the ICRC, CBE stated that Sorenson was selected for the position because he:

> was working as a team lead in the portfolio that he would be training. As a team lead his duties included training and developing employees who were non-performers. This is a

---

[1] CBE's Appendix (docket number 17-4) at 74.

> skill that is extremely important for a trainer and he had proven ability to do this successfully. He had only been with CBE for seven (7) months but he was in a front line collector role since his start date and had shown a progression of growth during that period of time.

CBE's Appendix (docket number 17-4) at 106.

### 2.   *Legal Collector*

On May 15, 2006, Clay applied for a position as a Legal Collector, or Post-Judgment Collector. Seven people applied for this position. CBE selected Connie Jensen to fill the position. In answers to questions from the ICRC, CBE explained that Jensen was selected for the position because of her "extensive front line collection experience, coupled with her extensive experience in skip tracing. [Jensen] has been employed with CBE since April, 2000."[2]

### 3.   *Front Line Supervisor*

On December 29, 2006, Clay applied for a position as a Front Line Supervisor. Twelve people applied for this position. On January 8, 2007, Clay interviewed for the position with Natalie Wissink and Kevin White. On January 11, 2007, Clay learned that she would not receive a second interview for the Front Line Supervisor position. Wissink and White offered feedback to Clay, and advised her that "there were other employees who had proven leadership qualities in a running a team" who received second interviews.[3] Wissink and White also told Clay that they were "both confident that she does her job well and would recommend trying to get into a Team Lead role to demonstrate her leadership abilities."[4] On January 23, 2007, Teresa Mendenhall, former Director of Operations, spoke with Clay regarding not receiving the Front Line Collector position:

---

[2] *Id.* at 109.

[3] *Id.* at 112.

[4] *Id.*

> I spoke to [Clay] about a claim that comments about race had
> something to do with the reason she wasn't chosen for the ED
> Front-line supervisor position. [Clay] denies ever making any
> statement like this, I asked [Clay] if she was given feedback
> from my managers as to why she did not receive a 2nd
> interview and she stated feedback was given and she was
> satisfied with their decision. During this conversation, I
> reinforced that [Clay] was informed by my managers that she
> needed to step into a Team Lead role for front-line and she
> needs to sign-up when we have the next team lead sign-ups,
> she agreed.

CBE's Appendix (docket number 17-4) at 92.[5] Ultimately, no individual was hired for this

position because Joe Potter, Vice President of Operations, decided not to fill the position.

---

[5] In answering questions for the ICRC, Clay described the events of the January 23,
2007 meeting with Mendenhall as follows:

> I was told that I was needed in the conference room when I
> came to work in the afternoon by Kim Selberg. When I
> entered the room, Teresa Mendenhall and Sabrina Lowery
> were in the room. I was told by Teresa that I was being
> addressed because there was a rumor of a racial comment that
> I made on the floor. She said that she was told that I was
> going around saying that I did not receive the supervisor
> position I applied for because I was black. She went on to say
> that comments like that were not acceptable and she was asked
> to address me. I was not asked what, if anything, I said. . . .
> Once in the conference room I was surprised to see Teresa and
> Sabrina because they have absolutely nothing to do with my
> day-to-day operations, so I wondered what they could possibly
> need to talk to me about. When Teresa told me what I was in
> the office for *I told her that what she heard was not true at all
> because I didn't even tell anyone I applied for the position so
> I wouldn't tell anyone that I didn't get it because I was black.*

Clay's Appendix at 153-54 (emphasis added).

Specifically, CBE determined that due to budgetary issues and supervisor-to-collector ratios, the position did not need to be filled.[6]

### 4.   PPA Supervisor and PPA Team Lead

CBE has no record of Clay applying for either a PPA Supervisor position, or a PPA Team Lead position.   According to her deposition testimony, Clay applied for these positions around the same time as she applied for the Front Line Supervisor position.   In her deposition, Clay stated:

> Q:   A PPA team lead?
> A:   Yes.
> Q:   And you referenced a PPA supervisor?
> A:   Yes.
> Q:   Did you formally apply for that one?
> A:   Scott Swonger, I had a formal application in at the time for front line supervisor that Scott Swonger told me to apply for.   He had told me he thought it was a really good position for me, apply for the front line supervisor position, you be the strongest candidate for this position and so on.   Well, he told me to apply for that because in the department that I was working in, PPA I asked him, Scott, are there going to be any supervisor team lead positions coming open, you know, anytime soon, and he said, no, we just don't need it.   There is not going to be, but apply for the front line supervisor position.   So I put my application in for that.   No sooner did I do that, the next week when I came to work there was a position, two positions, I think, like for either two PPA team leads and a PPA supervisor. I said, Scott, you told me to put this application in because there weren't going to be any openings in my own department.   And he was like, don't worry about it.   I will put your name on the list for the PPA supervisor and team lead positions.   Don't worry about it.   You will get an interview for those positions too. So I interviewed for the front line supervisor and team

---

[6] *See* CBE's Appendix (docket number 17-4) at 103.

> lead, never hear back anything.  They made a decision,
> and I never even got an interview.

Clay's Appendix at 9; Clay's Deposition at 47:1-48:8.

### B.  *Clay's Disciplinary History at CBE*

CBE has four levels of disciplinary action.  The four levels are:  (1) coaching, (2) verbal warning, (3) written warning, and (4) suspension.  Between May 2005 and February 2007, Clay received six coachings and one verbal warning.  During the last 12 months of Clay's employment, there are no records of Clay receiving any type of disciplinary action from CBE.[7]

### 1.  *Coachings*

On May 27, 2005, Clay received a coaching from Michael Fetters, her supervisor, for failing to be at her work station at the beginning of her shift.  The coaching was documented as follows:

> Today at 7:13 a.m., you were not at your desk.  I noticed coming back from the break room/restroom area.  The shift for collectors . . . starts at 7:00.  The expectation is that you are sitting at your desk ready to begin work at 7:00 and work until your first scheduled break.  You are responsible for having everything you need to start your shift on time.  This includes non-emergency restroom trips and snack or drink items.

CBE's Appendix (docket number 17-4) at 82.  Clay responded to the coaching in writing.  She stated that her trip to the restroom was both an isolated instance and an emergency.  Clay also stated that she believed the coaching was a "direct attack against me personally

---

[7] *See* CBE's Appendix (docket number 17-4) at 32.  Clay's deposition testimony provides that:

> Q:   And it looks like for approximately the last year of your employment you didn't receive any coachings or warnings; is that true?
>
> A:   Yeah, I believe so.  At least documented ones.

*Id.*; Clay's Deposition at 126:8-11.

because if I had not gone to the restroom [at] 7:13 am what would this coaching have been about?  This form was previously created specifically for me, waiting for me on the 27th, without legitimate cause."[8]  Clay also discussed this coaching in her deposition testimony:

> Q:   Did you anywhere – in your handwritten response did you anywhere allege that you were being singled out because of your race?
>
> A:   I did not include race directly, but I think this still speaks to race.  I didn't speak to race specifically, like write the word race, but I did mention that – I do mention that white co-workers were allowed to do the same thing.
>         . . .
> Q:   My question is, you did not identify the race of your co-workers in this summary identified on pages 10 or 11, true?
>
> A:   No, that would have been inappropriate.
> Q:   Anything else?
> A:   No.

CBE's Appendix (docket number 17-4) at 30-31; Clay's Deposition at 121:10-122:3.

On June 14, 2005, Clay received a coaching from Fetters for discussing an unavailable settlement and rehabilitation option with a borrower.  Fetters noted that Clay must "pay close attention to who has ownership of an account before we talk to the borrower about the account."[9]   At her deposition, Clay stated that she believed she received the coaching in retaliation for complaining about white co-workers being allowed to stay on daytime shifts, instead of being moved to blended shifts.  Specifically, Clay testified that:

> Q:   Is there anything other than the fact that the coaching session came after you made your complaint that leads you to believe this was an act of discrimination against you?

---

[8]  CBE's Appendix (docket number 17-4) at 83.

[9]  *Id.* at 76.

| | |
|---|---|
| A: | Yeah, because after I complained about the daytime team, that is when stuff like this started happening. I started getting little disciplines where they would just – and some of them weren't – I didn't get anything written. Like I said, I didn't know there was a procedure after every coaching to get something written, because sometimes they would just pull me off the phone and pull me into the office and say, hey, just wanted to let you know this, that or the other. And I would be sitting there like, okay, why did I get pulled off the phone for this? So I started getting picked on. |
| Q: | Anything else? |
| A: | No. |

Clay's Appendix at 24-25; Clay's Deposition 109:23-110:15.

On November 4, 2005, Clay received a coaching for a "VAP error report" from Sabrina Lowery, one of Clay's supervisors. In her deposition, Clay noted that she did not find this coaching to be discriminatory. She stated "vap errors happen all the time. It wasn't a big deal."[10]

On February 27, 2006, Clay received a coaching for violating CBE's dress code. According to CBE, Clay wore sweatpants to work, which is a violation of the dress code outlined in the Employee Handbook. In her deposition, Clay stated that she believed this coaching was an act of discrimination:

> Because I was not wearing sweatpants, and [the supervisor] did not witness me wearing those pants, and then bring me in because of something she witnessed. She actually told me a white – Well, she didn't say they were white. It was a white co-worker that pointed it out to her, and that is why she brought me in the office. And then I noticed either the same week or the following week a white co-worker wearing exactly the same pants that worked around [the supervisor] and Nicole Gimmilan, and nothing was said to Nicole.

CBE's Appendix (docket number 17-4) at 28; Clay's Deposition at 118:5-15.

---

[10] *Id.* at 23; Clay's Deposition 104:22-23.

On April 13, 2006, Clay received a coaching from Lowery for running a borrower's credit card twice and causing an insufficient-funds charge for the borrower. Clay did not dispute the coaching and indicated in her deposition that it was not an act of discrimination. On February 23, 2007, Clay received a coaching from Fetters for a "VAP error." Again, Clay did not dispute the coaching or believe that it was an act of discrimination against her.

### 2.   *Verbal Warning*

On February 6, 2006, Clay received a verbal warning from Beth Akenbauer, a supervisor, for attendance issues, including tardiness and use of paid-time-off ("PTO") versus make-up time. CBE's record of Clay's verbal warning provides:

> On several instances within the last 30 days there has been an issue with attendance including tardiness and PTO vs. makeup time. On, Monday, 1/16/2006 [Clay] called in fro [*sic*] her shift at 8:32 when scheduled at 8:00 AM. On Monday 1/30/2006 [Clay] called and left a message on my voice mail stating that the servicing on her automobile was taking longer than expected and would be late returning from lunch. On Thursday 2/2/06 [Clay] was a no call no show for her shift beginning at 12:00 PM. She did arrive 30 minutes late. Again on 2/3/06 [Clay] called again stating that she will be late from her lunch (11:30-12:30) because she is closing on a home.
>
> Many of these issues could fit within the employee handbook guidelines if a member of management would have been informed of the possibilities before it was too late. When an employee is late from lunch it affects the staffing and when other co-workers can leave for their lunches/breaks. If management is aware of a situation we can work other possibilities for the effected staff.
>
> In addition all of the missed time that is or is not in correspondence with employee handbook required to take PTO and this time cannot be made up unless the needs of the business demand it. . . .

CBE's Appendix (docket number 17-4) at 81.   In her deposition, Clay admitted that nothing in the verbal warning report constituted "an act of discrimination" against her.[11] Other facts that are significant for making a determination on CBE's Motion for Summary Judgment will be discussed, as necessary, in the Court's consideration of the legal issues presented.

### IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).   A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'"  *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)).   A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'"  *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)).   Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'"  *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party.").   "'Evidence, not contentions, avoids summary judgment.'"  *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).   The court must view the record in the light most favorable to the nonmoving party

---

[11]  *See* CBE's Appendix (docket number 17-4) at 29; Clay's Deposition at 119:18-24.

and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## V. DISCUSSION

CBE asserts that it is entitled to summary judgment on Clay's claims of discrimination because her claims are untimely. In the alternative, CBE argues that Clay's claims of race discrimination, hostile work environment/harassment based on race, retaliation, and constructive discharge all fail as a matter of law. Clay resists and argues that (1) her claims are timely, and (2) CBE is precluded from summary judgment because material facts are in dispute with regard to the issues of race discrimination, hostile work environment/harassment based on race, retaliation, and constructive discharge.

### A. Are Clay's Claims Timely?

The applicable statute of limitations for a race discrimination claim under 42 U.S.C. § 1981 is four years. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) (providing that the 4-year statute of limitations provision in 28 U.S.C. § 1658 is applicable to claims under § 1981). Clay filed her complaint on March 1, 2011. Therefore, in order to meet the applicable statute of limitations, Clay's claims must have occurred on or after March 1, 2007.

CBE argues that "[b]ecause the majority of events that comprise the basis of Clay's claims took place prior to March 1, 2007, each claim of discrimination, harassment, or retaliation that is based on those events should be dismissed as time-barred."[12] Specifically, CBE points out that Clay's race discrimination and retaliation claims are based on five positions she applied for – and did not receive – between January 2006 and January 2007, all of which are outside the statute of limitations. Similarly, CBE argues that Clay's complaint of being disciplined differently than her white co-workers is also

_____

[12] CBE's Brief in Support of Motion for Summary Judgment (docket number 17-1) at 3.

time-barred because her discipline record shows that she was coached or verbally warned between May 2005 and February 2007. There is no formal record of discipline for Clay during her last 12 months of employment at CBE.

Clay argues that all of her claims "reach back to all continuing violations that existed on or after March 11, 2007 [*sic*]."[13] Specifically, Clay asserts that her "Statement of Additional Disputed Facts shows that acts of discrimination, retaliation, and actions which constitute a hostile work environment occurred within the statute of limitations period from March 11, 2011, [*sic*] back to March 11, 2007 [*sic*]."[14] Clay concludes that:

> If the Court finds that questions of fact exist regarding at least one intertwined act of discrimination, hostility, and retaliation within the applicable four-year limitation period, [she] should be allowed to present claims for all adverse behavior encompassed by the continuing violation doctrine.

Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 14.

In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the United States Supreme Court addressed the continuing violation doctrine in Title VII cases. The Supreme Court determined that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id*. at 113. The Supreme Court further explained that:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' [A plaintiff] can only file a charge to

---

[13] Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 13.

[14] *Id*.

> cover discrete acts that 'occurred' within the appropriate time
> period.

*Id.* at 114.

The Supreme Court further determined, however, that hostile work environment claims are different in kind from discrete acts of discrimination. *Id.* at 115. Specifically, in hostile work environment claims, "[t]he 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* (Citation omitted). The Supreme Court concluded that because "the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within [the statutory period] of any act that is part of the hostile work environment." *Id.* at 118. The Supreme Court illustrated this conclusion as follows:

> The following scenarios illustrate our point: (1) Acts on days 1-400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1-100 and on day 401, but there are no acts between days 101-400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one 'unlawful employment practice' and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. . . . On the other hand, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.

*Id.* Factors to consider in determining a continuing violation include "whether the same harasser committed the same harassing acts before and after the limitations deadline; whether the employer was made aware of the earlier harassment; and whether there was any 'intervening action' by the employer that could fairly be said to have caused the later acts of harassment to be unrelated to the earlier, otherwise untimely acts." *Morris v. Conagra Foods, Inc.*, 435 F. Supp. 2d 887, 902 (N.D. Iowa 2005); *see also Rowe v. Hussmann Corp.*, 381 F.3d 775, 781 (Finding a continuing violation because "it was the same harasser . . . committing the same harassing acts both before and after [the limitations period with] . . . no evidence of any 'intervening action[.]'").

While *Morgan* only specifically addresses the limitations period for Title VII claims, the Eighth Circuit Court of Appeals has determined that the principles discussed in *Morgan* are applicable in employment discrimination claims brought under § 1981. *See Madison v. IBP, Inc.*, 330 F.3d 1051 (8th Cir. 2003) ("Because § 1981 allows for recovery for the same type of employment discrimination as Title VII, we believe that the distinction between discrete acts and hostile work environment claims should have equal effect on the respective recovery periods for the two statutes.").

Here, Clay's claims of race discrimination based on discipline, failure to promote, and retaliation are all based on incidents which occurred before March 1, 2007. Clay's disciplinary record while employed at CBE involved six coachings between May 27, 2005 and February 23, 2007. Clay also had a verbal warning on February 6, 2006. Clay's claim of failure to promote because of her race involves applications to various positions between January 2006 and January 2007. With regard to retaliation, Clay focuses on two incidents in January 2007 and April 2007.[15] Because all of Clay's claims for race

_____

[15] In her brief, Clay asserts that she "filed a good faith complaint regarding racial discrimination and harassment in April of 2007 after Supervisor Selberg improperly altered [her] time log to reflect that [she] returned late from lunch." Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 34. In support of her claim, Clay refers to a written statement she gave to the ICRC and a

(continued...)

discrimination based on discipline, failure to promote, and retaliation occurred before March 1, 2007, the Court finds that these claims are time-barred. *See Morgan*, 536 U.S. at 114 ("[A plaintiff] can only file a charge to cover discrete acts that 'occurred' within the appropriate time period.").

Turning to her claim of a hostile work environment, Clay simply asserts that her "Statement of Additional Disputed Facts shows that acts of discrimination, retaliation, and actions which constitute a hostile work environment occurred within the statute of limitations period from March 11, 2011, [*sic*] back to March 11, 2007 [*sic*]."[16]   CBE responds that:

> All of Clay's claimed lost promotions and acts of discipline occurred outside of the limitations period, spanning a time period of January 16, 2006 – February 23, 2007. These decisions involved upwards of six different CBE employees, all occupying different positions within the company. . . . Here, the only alleged harassing conduct of which Clay complains that occurred during the limitations period consists of four events, three of which involved Supervisor Kim Selberg (who was not involved in any of the pre-limitations period of conduct) and one of which involved Manager Deahonne Teal (who was involved in one of the pre-limitations period conduct (an instance of discipline)). . . . There is no nexus between Clay's failure to receive promotions in 2006 and Supervisor Kim Selberg's alleged refusal to allow Clay to make up time or Deahonne Teal's alleged disciplining Clay for violating the dress code in 2007. Consequently, the time-barred events may not provide the basis for liability.

---

[15] (...continued)
portion of deposition testimony regarding a conversation she had with another employee about having her time card changed because of her race. *See* Clay's Appendix at 22; 172-73. This evidence, however, does not address the issue of retaliation. While Clay may have complained about a supervisor changing her time card, she offers no evidence regarding how she was retaliated against for this complaint.

[16] Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 34.

CBE's Reply in Support of Its Motion for Summary Judgment (docket number 28-1) at 2-4.  The Court agrees with CBE.

Clay's assertion of a hostile work environment is based on an amalgamation of discrete incidents, involving different departments within CBE and different CBE employees, and not one "unlawful employment practice." *See Morgan*, 536 U.S. at 118; *see also Morris*, 435 F. Supp. 2d at 902.  In other words, Clay's claim is not like the plaintiff's claim in *Rowe*, where:

> it was the same harasser . . . committing the same harassing acts both before and after [the limitations period]; there was evidence that [the defendant] was made aware of this harassment . . .; and there is no evidence of any 'intervening action,' . . . by [the defendant] that can fairly be said to have caused the later acts of sexual harassment to be unrelated to those which occurred during the period when Rowe was first forced to run the gauntlet of [the harasser's] repeated verbal and physical harassment and abuse. Accordingly, we conclude as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action.

381 F.3d at 781 (Citations omitted).  Here, Clay's allegations of a hostile work environment are not similar in nature, frequency, and severity before and after the limitations period. *Id.*  As CBE correctly points out, Selberg's actions and Teal's actions are not related to Clay's complaints and allegations during the pre-limitations time period. Clay also offers no evidence that Selberg's and Teal's actions were a form of retaliation. Therefore, the Court concludes that Selberg's and Teal's actions are not part of one unlawful employment practice, and do not create a continuing violation. *See Morgan*, 536 U.S. at 118; *see also Morris*, 435 F. Supp. 2d at 902.  Accordingly, the Court determines that Clay's claim of a hostile work environment is also time-barred.

## B.  Did CBE Discriminate Against Clay Based on Her Race?

Even *if* Clay's claims had been timely filed, the Court believes they are without merit.  Clay alleges that she was discriminated against based on her race in violation of 42 U.S.C. § 1981.  Specifically, Clay argues that she was discriminated against because:  (1) she was disciplined more harshly than other employees because of her race; (2) she did not receive promotions due to her race; (3) she was subjected to a hostile work environment because of her race; and (4) CBE retaliated against her for complaining about race discrimination.  Finally, Clay also argues that she was constructively discharged as a result of the race discrimination she faced while employed at CBE.

Because Clay presents no direct evidence of intentional race discrimination, but rather bases her claims on circumstantial evidence, the Court applies the analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 729 (1973) to Clay's race discrimination claims.[17]  *See also Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d

---

[17]  In her brief, Clay "objects" to the use of the *McDonnell Douglas* analytical framework "entirely."  Clay argues that:

> The *McDonnell Douglas* summary judgment standard requires the Plaintiff's discrimination claims to adhere to a heightened summary judgment standard that a jury of her peers will not adhere to at trial.  In a summary judgment motion for a discrimination claim, the Courts often apply some version of the burden shifting standard originally created by *McDonnell Douglas*.  When presented with the same evidence at trial, however, a jury will simply be instructed to decide whether Ms. Clay's race was a motivating factor in one or more adverse actions.

Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 24.  Clay "hopes the Court will simply follow the same standard that a jury would at trial[.]"  *Id.*  Clay offers no authority to support her position.  Therefore, the Court will follow the traditional *McDonnell Douglas* burden-shifting framework in analyzing Clay's employment discrimination claims.  *See Chappell v. Bilco Co.*, 675 F.3d 1110, 1118 (8th Cir. 2012) ("[R]ace discrimination claims are . . .

(continued...)

18

1191, 1196 (8th Cir. 2006) (providing that the *McDonnell Douglas* burden-shifting framework governs claims of race discrimination under 42 U.S.C. § 1981). Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first establish a prima facie case of discrimination. *Id.* If the plaintiff does so, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the allegedly discriminatory action. *Id.* If the employer provides such a reason, then the burden shifts back to the plaintiff to present evidence that the employer's reason was a pretext for the discriminatory action. *Id.*

### 1.    *Race Discrimination Based on Discipline*

In order to establish a prima facie case of race discrimination, Clay must show that: (1) she is a member of a protected class; (2) she was meeting the legitimate job expectations of her employer; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated differently. *Chappell v. Bilco Co.*, 675 F.3d 1110, 1118 (8th Cir. 2012). With regard to the fourth element, in order to be similarly situated, "'the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 796 (8th Cir. 2011) (quoting *Wierman v. Casey's General Stores*, 638 F.3d 984, 994 (8th Cir. 2011)).

CBE concedes that Clay meets the first two elements of her prima facie race discrimination case. As to the third element, Clay argues that CBE's "disciplinary actions

---

[17](...continued)
evaluated under the *McDonnell Douglas* burden-shifting framework."). The Court notes that after making her novel argument with regard to the *McDonnell Douglas* framework, Clay asserts that she "will nonetheless demonstrate how the evidence meets the burden shifting standard that requires her to present a prima facie case along with a showing of pretext." Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 24.

affected her ability to receive promotions and therefore denied her an increase in pay."[18]
The Court believes that Clay's argument is sufficient for her prima facie case.

Turning to the fourth element, Clay maintains that:

> CBE also argues that Ms. Clay's claims fail because she can
> offer no evidence that similarly situated white employees were
> treated differently. Defendant's [*sic*] have failed to carry their
> burden of proof to even try to respond [or] explain the
> numerous examples in the record of examples of white
> employees receiving preferable treatment regarding
> disciplinary decisions.

Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment
(docket number 21-3) at 32.   Clay refers the Court to various numbered paragraphs
contained in her Statement of Additional Undisputed Facts to support her contention that
she was treated differently than her white co-workers.  *See id*.

For example, Clay alleges that white employees were not disciplined for committing
mistakes;[19] white employees were not disciplined for switching schedules;[20] and white
employees were not disciplined for not following the dress code policy.[21]  Clay supports
these allegations with nothing more than her written statements provided to the ICRC.
These written statements offer nothing more than self-serving allegations without
supporting evidence.  *See Anda*, 517 F.3d at 531 (In order to establish the existence of a
genuine dispute as to a material fact, the non-moving party "'may not merely point to
unsupported self-serving allegations'" and "'must substantiate [its] allegations with
sufficient probative evidence that would permit a finding in [its] favor.'") (quotation

---

[18] Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary
Judgment (docket number 21-3) at 31.

[19] *See* Plaintiff's Statement of Additional Disputed Facts and Inferences at 6;
¶ 30 and 28; ¶ 161.

[20] *Id*. at 18-19; ¶ 98.

[21] *Id*. at 11-12; ¶¶ 54-57.

omitted); *see also Reasonover*, 447 F.3d at 578 ("'Evidence, not contentions, avoids summary judgment.'") (quotation omitted).

Clay also alleges that unlike white employees, African American employees were not allowed to get away with unexcused absences.[22]   This allegation, however, is not supported by the evidence in the record.  Clay cites Dana Sparks and Kellie Jo Fabian as white employees who were not disciplined for unexcused absences.  However, both Sparks and Fabian were disciplined for tardiness and unexcused absences.[23]

Additionally, Clay alleges that when she was called into a conference room by a supervisor, she felt "a humiliating, stigmatizing effect that white employees were generally spared from."[24]   Again, Clay's assertion is nothing more than a generalization without evidence to support her assertion that white employees generally were not called into a conference room by a supervisor, or did not feel humiliated or stigmatized when they were called into a conference room.  *See Reasonover*, 447 F.3d at 578 ("'Evidence, not contentions, avoids summary judgment.'") (quotation omitted).

Based on the foregoing, the Court believes that Clay has failed to meet the requirements of element four of her prima facie case of race discrimination.  Clay has not offered evidence that other employees, who were not in the protected class, were similarly situated.  Specifically, she has not shown other employees who "'have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'"  *Barber*, 656 F.3d at 796. (quotation omitted).  Instead, Clay has offered nothing more than her opinion that other

---

[22] *See id.* at 9; ¶ 43.

[23] *See* CBE's Supplemental Appendix (docket number 29-1) at 397-403 (four separate written warnings for Dana Sparks regarding tardiness and unexcused absences); 404-405 (emails documenting a coaching and verbal warning to Kellie Jo Fabian for tardiness and attendance issues).

[24] *See* Plaintiff's Statement of Additional Disputed Facts and Inferences at 25; ¶ 141; *see also id.* at 28; ¶ 157 (same).

employees were similarly situated and treated more favorably. Therefore, Clay's claim for race discrimination based on discipline does not survive summary judgment because she is unable to "substantiate her allegations with more than 'speculation, conjecture, or fantasy.'" *Marquez v. Bridgestone/Firestone, Inc.*, 353 F.3d 1037 (8th Cir. 2004) (per curiam) (citing *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003)). Accordingly, the Court determines that because Clay is unable to establish her prima facie case, CBE is entitled to summary judgment on Clay's race discrimination claim based on discipline, even *if* it had been timely filed.

### 2.   *Race Discrimination Based on a Failure to Promote*

A prima facie case for an allegation that an employer failed to promote an employee because of his or her race requires the plaintiff to show that:  (1) she is a member of a protected group; (2) she applied for a promotion to a position for which the employer was seeking applicants and for which she was qualified; (3) she was not promoted; and (4) similarly situated employees who did not belong to the protected class were promoted instead. *Bennett v. NucorCorp.*, 656 F.3d 802, 819-20 (8th Cir. 2011) (citing *Austin v. Minnesota Mining & Mfg. Co.*, 193 F.3d 992, 995 (8th Cir. 1999)).  Because Clay is a member of a protected group, applied for various positions for which the employer was seeking applicants, was not promoted, and employees not belonging to the protected class were promoted instead of her, the Court finds that Clay has met the requirements of her prima facie case.

Therefore, the burden shifts to CBE to articulate a legitimate non-discriminatory reason for promoting other employees outside the protected class, instead of promoting Clay to various positions posted at CBE.  Here, CBE sets forth that Clay was not promoted to:  (1) the Collection Trainer and Legal Collector positions because she lacked the experience of the individuals who were selected for those positions; (2) the Frontline Supervisor position because there were other candidates who had "proven leadership

qualities in running a team";[25] and (3) the PPA Supervisor and PPA Team lead positions because there is no record that she applied for those positions.[26] The Court finds that CBE articulated legitimate, non-discriminatory reasons for not promoting Clay to the various positions she applied for while employed at CBE.

Therefore, the burden shifts back to Clay to present evidence that the employer's reasons were a pretext for race discrimination. Clay argues that the individual who was hired for the Collection Trainer position did not actually have more experience than she did. Clay asserts that she did not receive the Legal Collector position because she was too good of an employee to be moved from her current position. Clay maintains that the Frontline Supervisor position was ultimately cancelled because of Clay's race. Lastly,

_____

[25] Moreover, ultimately, no individual was hired for this position because Joe Potter, Vice President of Operations, decided not to fill the position. Specifically, CBE determined that due to budgetary issues and supervisor-to-collector ratios, the position did not need to be filled. *See* CBE's Appendix (docket number 17-4) at 103.

[26] Clay also alleges that she was not promoted to Team Lead positions throughout her employment at CBE. Clay does not specifically address which Team Lead positions she applied for, but states that "[t]hroughout Ms. Clay's three years of employment with CBE, CBE failed to promote her for numerous Team Lead positions available in every department she worked in. White employees received every available position." Plaintiff's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 27. There is no evidence that Clay applied for any Team Lead positions. CBE acknowledges that prior to 2006, a formal application process was not always necessary for a Team Lead position. *See* Clay's Appendix at 70; Mary Phillips' Deposition at 67:10-15. Clay points to one Team Lead position in 2005 that she was interested in, but did not receive. *See* Plaintiff's Statement of Additional Disputed Facts and Inferences at 7-8; ¶¶ 36-40. Clay offers only evidence from her own written statement to the ICRC expressing her opinion that she was more qualified for the position, and did not receive it because of her race. "Conclusory assertions that the plaintiff was qualified are insufficient" for purposes of summary judgment. *Bennett*, 656 F.3d at 820; *see also Reasonover*, 447 F.3d at 578 ("'Evidence, not contentions, avoids summary judgment.'") (quotation omitted). The Court concludes that Clay's allegations regarding failure to promote to Team Lead positions are not supported by sufficient evidence to defeat summary judgment.

Clay argues that she informally applied for the PPA Supervisor and PPA Team Lead positions by telling her supervisor that she wanted to be considered for those positions.

In order to support a finding of pretext, Clay must show that CBE hired a less qualified candidate. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1049 (8th Cir. 2011). Nate Sorenson was selected to fill the position of Collection Trainer.   In answers to questions from the ICRC, CBE stated that Sorenson was selected for the position because he:

> was working as a team lead in the portfolio that he would be training.   As a team lead his duties included training and developing employees who were non-performers.  This is a skill that is extremely important for a trainer and he had proven ability to do this successfully.  He had only been with CBE for seven (7) months but he was in a front line collector role since his start date and had shown a progression of growth during that period of time.

CBE's Appendix (docket number 17-4) at 106.  Similarly, CBE selected Connie Jensen to fill the Legal Collector position.  In answers to questions from the ICRC, CBE explained that Jensen was selected for the position because of her "extensive front line collection experience, coupled with her extensive experience in skip tracing.  [Jensen] has been employed with CBE since April, 2000."[27]  In both instances, Clay is unable to show that CBE hired the less qualified candidate.  Sorenson, unlike Clay, was already working as the team lead for the group he would be training.  Clay had no experience as a team lead when she applied for the Collection Trainer position.  Similarly, at the time they applied for the Legal Collector position, Jensen had six years of experience at CBE, to Clay's one year of experience.  Accordingly, CBE is entitled to summary judgment on Clay's claims for discrimination in failure to promote her to the Collection Trainer and Legal Collector positions.

---

[27] CBE's Appendix (docket number 17-4) at 109.

Regarding the Frontline Supervisor position, Clay offers no evidence to support her contention that the position was not filled because of her race.  CBE determined that due to budgetary issues and supervisor-to-collector ratios, the position did not need to be filled.[28]  Clay's unsubstantiated claim that the position was not filled because of her race is insufficient for purposes of summary judgment.  *See Anda*, 517 F.3d at 531 (In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations'" and "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'") (quotation omitted); *Reasonover*, 447 F.3d at 578 ("'Evidence, not contentions, avoids summary judgment.'") (quotation omitted).  Accordingly, the Court finds that CBE is entitled to summary judgment on Clay's claim for discrimination in failure to promote her to the Frontline Supervisor position.

Similarly, Clay's claim that she informally applied for the PPA Supervisor and PPA Team Lead positions is only supported by her deposition claim that her supervisor told her that she would get an interview for those positions.  She offers no other evidence to support this contention.  Moreover, there is no evidence that she formally applied for either position.  Therefore, the Court finds that CBE is entitled to summary judgment on Clay's claim for discrimination in failure to promote her to the PPA Supervisor and PPA Team Lead positions.  *See Reasonover*, 447 F.3d at 578 ("'Evidence, not contentions, avoids summary judgment.'") (quotation omitted).

In conclusion, the Court finds that even if her lawsuit had been timely filed, Clay has failed to show that she was not promoted by CBE to various positions throughout her employment due to race discrimination.  Specifically, Clay has failed to show that CBE's legitimate, non-discriminatory reasons for not promoting her were pretext for race discrimination.  Accordingly, the Court determines that CBE is entitled to summary judgment on Clay's race discrimination claim for failure to promote.

---

[28] *See* CBE's Appendix (docket number 17-4) at 103.

*3.     Race Discrimination Based on a Hostile Work Environment*

The standards applied to evaluate a hostile work environment claim under 42 U.S.C. § 1981, are the same standards used to evaluate such a claim under Title VII. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (citing *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1050 (8th Cir. 2002)). In order to establish a prima facie case for a hostile work environment, Clay must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome race-based harassment; (3) the harassment was because of her membership in the protected class; and (4) the harassment affected a term, condition, or privilege of her employment. *Anderson*, 606 F.3d at 518. (Citation omitted).

"Hostile work environment harassment occurs when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Singletary v. Missouri Department of Corrections*, 423 F.3d 886, 892 (8th Cir. 2005) (quoting *Tademe v. Saint Cloud State University*, 328 F.3d 982, 991 (8th Cir. 2003)). "The environment must be both objectively hostile as perceived by a reasonable person and subjectively abusive as actually viewed by [the plaintiff]." *Anderson*, 606 F.3d at 518 (citing *Bowen v. Missouri Department of Social Services*, 311 F.3d 878, 883 (8th Cir. 2002)). In considering the objective component, courts examine the totality of the circumstances, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Singletary*, 423 F.3d at 893 (citing *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004)). Additionally, if a plaintiff attempts to establish a hostile work environment based on the actions of co-workers, she must also show that "the employer knew or should have know of the harassment and failed to take prompt and effective remedial action." *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008) (citation omitted).

Finally, in *Anderson*, the Eighth Circuit Court of Appeals explained the demanding nature of the standards required to be met in a hostile work environment claim:

> Hostile work environment claims must meet 'demanding' standards and courts are to 'filter out' those complaints concerning the 'ordinary tribulations of the workplace.' 'Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' 'Mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate § 1981.'

606 F.3d at 519 (quotations omitted).

In her brief, Clay does not explicitly address any instances of a hostile work environment. Instead, Clay refers to approximately 58 paragraphs in her Statement of Additional Disputed Facts and Inferences, which she asserts support her claim of a hostile work environment. *See* Clay's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 16-17 (listing paragraphs in Statement of Additional Disputed Facts and Inferences). In reviewing these paragraphs, approximately 7 refer to instances of discipline, 3 refer to CBE's failure to promote her, 7 refer to generally being treated differently than white co-workers, and 9 refer to single instances where 9 different supervisors or co-workers allegedly made derogatory comments or treated her differently than white employees.

The paragraphs that refer to instances of discipline and failure to promote are the same paragraphs used by Clay to support her claims of race discrimination in discipline and failure to promote. In sections *V.B.1* and *2*, the Court determined that Clay failed to present sufficient evidence of race discrimination in the areas of discipline and failure to promote to defeat summary judgment. Therefore, the Court finds that such allegations also fail to support her claim for a hostile work environment.

The other paragraphs discuss ways in which Clay was treated differently from other white employees, and instances of derogatory comments. These allegations include: (1) a

general allegation of receiving a less desirable shift assignment than white co-workers; (2) a general allegation that Scott Swonger, a supervisor, audited her calls more than her white co-workers; (3) unidentified "supervisors" not allowing African-Americans to talk to each other at their work stations; (4) supervisors in the Quality Control department not allowing Clay to dock time to take care of her children, but allowing white employees to do so; (5) overhearing that a co-worker in a different department called an African-American supervisor in that department, a "black bitch"; (6) Teresa Mendenhall, a supervisor, referring to Clay's hair as "nappy"; and (7) knowledge that two supervisors in different departments, Kim Postal and Jay Bracken, made at least three derogatory comments about African-Americans.

Other than her general allegations that she received a less desirable shift assignment than her white co-workers, Swonger audited her calls more than white co-workers, unidentified supervisors not allowing African-Americans to talk to each other at their work stations, and supervisors in the Quality Control Department not allowing her to dock time to take care of her children, but allowing white co-workers to do so, Clay offers no evidence to support these contentions. *See Reasonover*, 447 F.3d at 578 ("'Evidence, not contentions, avoids summary judgment.'") (quotation omitted). With regard to the alleged derogatory comments in the workplace, Clay alleges one comment made to her by Mendenhall and "knowledge" of other comments made by supervisors and co-workers in different departments from Clay's department. "'Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Anderson*, 606 F.3d at 519 (quoting *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006)). While, if true, the Court does not condone the four derogatory comments alleged by Clay to have been made in the workplace, the Court nevertheless finds that the comments were isolated incidents, and do not rise to the level necessary for a hostile work environment. *See Id.*

Additionally, Clay points out several instances with Kim Selberg, another supervisor, who Clay alleges subjected her to a hostile work environment because of her race. Specifically, Clay alleges that Selberg: (1) did not give her requested time-off that she gave white employees on two separate instances; (2) did not provide positive comments regarding her work; (3) once purposefully changed her time log to reflect that she was late from her lunch break when she was not late; and (4) did not allow her to have items on her desk that white employees could have on their desks. Again, other than her general allegations, Clay offers no evidence to support these contentions. *See Reasonover*, 447 F.3d at 578 ("'Evidence, not contentions, avoids summary judgment.'") (quotation omitted). Moreover, on April 6, 2007, Clay spoke with Misty Erdahl, a manager at CBE, about the problems she had with Selberg. In response, CBE moved Clay's desk away from Selberg's desk and assigned her to a different supervisor.[29]

Having considered the totality of the circumstances, the Court finds that Clay's allegations generally constitute infrequent, single incidents of discriminatory conduct, with low-levels of severity, which were not physically threatening, and did not interfere with her work performance. *See Singletary*, 423 F.3d at 893. Thus, Clay's workplace was not "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 892 (quotation omitted). Therefore, the Court concludes that a reasonable person would not objectively perceive Clay's workplace to be hostile. *See Anderson*, 606 F.3d at 518. Accordingly, the Court determines that even if this action had been timely filed, CBE is entitled to summary judgment on Clay's hostile work environment claim.

### C. *Clay's Retaliation Claim*

Section 1981 retaliation claims are analyzed under the same framework as Title VII claims. *Gacek v. Owens & Minor Distribution, Inc.*, 666 F.3d 1142, 1146 (8th Cir.

---

[29] *See* CBE's Appendix (docket number 17-4) at 107.

2012).  In order to establish a prima facie case of retaliation, Clay must show that:  (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two events.  *Id.*

Clay is unable to meet the requirements of her prima facie case.  The record contains no formal complaint of race discrimination or racial harassment to CBE.  Clay argues that the "clearest retaliation [she] faced occurred on January 23, 2007, when Director Mendenhall called [her] into a conference room and informed [her] that her complaints of racial discrimination 'were not acceptable.'"[30]  Clay's assertion, however, is not supported by her own written statement to the ICRC.  In answering questions for the ICRC, Clay described the events of the January 23, 2007 meeting with Mendenhall as follows:

> I was told that I was needed in the conference room when I came to work in the afternoon by Kim Selberg.  When I entered the room, Teresa Mendenhall and Sabrina Lowery were in the room.  I was told by Teresa that I was being addressed because there was a rumor of a racial comment that I made on the floor.  She said that she was told that I was going around saying that I did not receive the supervisor position I applied for because I was black.  She went on to say that comments like that were not acceptable and she was asked to address me.  I was not asked what, if anything, I said. . . . Once in the conference room I was surprised to see Teresa and Sabrina because they have absolutely nothing to do with my day-to-day operations, so I wondered what they could possibly need to talk to me about.  When Teresa told me what I was in the office for *I told her that what she heard was not true at all because I didn't even tell anyone I applied for the position so I wouldn't tell anyone that I didn't get it because I was black.*

---

[30]  Plaintiff's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 32.

Clay's Appendix at 153-54 (emphasis added). Based on her own admission, Clay did not claim that she was discriminated against because of her race, and offers nothing suggesting that she suffered an adverse employment action as a result.

Clay also asserts that her meeting with Misty Erdahl on April 6, 2007, about the problems she had with Selberg, was an instance of retaliation. Again, Clay's assertion is not supported by the record. In response to Clay's complaints about Selberg and following her meeting with Erdahl, CBE moved Clay's desk away from Selberg's desk and assigned her to a different supervisor.[31] Clearly, Clay did not suffer an adverse employment action as a result of her complaints about Selberg. Because Clay is unable to meet the requirements of her prima facie case for retaliation, the Court finds that her claim fails and CBE is entitled to summary judgment.

### D. Clay's Constructive Discharge Claim

Clay also claims that she was constructively discharged from her employment with CBE. Specifically, Clay argues that "[i]f she endured any discrimination or retaliation or even some of the hostility described above, she had a right to resign her position and maintain a claim for damages that should be self evident."[32] Clay concludes that "[t]he facts show that [she] was forced to resign, and that CBE clearly hoped, or intended the reasonable consequences of its actions, would be that she resigned."[33]

In order to prove a claim of constructive discharge, Clay must show that her "'employer deliberately created intolerable working conditions with the intention of forcing her to quit.'" *Sanders v. Lee County School District No. 1*, 669 F.3d 888, 893 (8th Cir. 2012) (quoting *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010)). In other words, if "'an employee quits because she reasonably believes there is

---

[31] *See* CBE's Appendix (docket number 17-4) at 107.

[32] Plaintiff's Brief in Support of Her Resistance to Defendant's Motion for Summary Judgment (docket number 21-3) at 39-40.

[33] *Id.* at 41.

no chance of fair treatment, there has been a constructive discharge.'" *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir. 2000) (quoting *Kimzey v. Wal-Mart Stores*, 107 F.3d 568, 574 (8th Cir. 1997)). In *Tatom v. Georgia-Pacific Corp.*, 228 F.3d 926, 932 (8th Cir. 2000), the Eighth Circuit Court of Appeals explained that:

> to prove that a constructive discharge occurred, the plaintiff must demonstrate that a reasonable person would find the working conditions intolerable. The intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings; the question is whether working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative.

*Id.* (citations omitted). Evidence of the employer's intent may be proven "through direct evidence or through evidence that 'the employer . . . could have reasonably foreseen that the employee would quit as a result of its actions.'" *Fercello v. County of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010) (quoting *Wright v. Rolette County*, 417 F.3d 879, 886 (8th Cir. 2005)). The employee, however, is required to give her "employer a reasonable opportunity to resolve a problem before quitting." *Sanders*, 669 F.3d at 893.

The record does not support Clay's constructive discharge claim. According to her resignation, Clay quit for "personal reasons."[34] Moreover, the Court finds that a reasonable person would not have found Clay's working conditions intolerable, and would not have "deemed resignation the only plausible alternative." *Tatom*, 228 F.3d at 932. Accordingly, the Court finds that CBE is entitled to summary judgment on Clay's constructive discharge claim.

## VI. CONCLUSION

The Court concludes that CBE is entitled to summary judgment on all of Clay's claims. Clay's claims are untimely and do not meet the applicable statute of limitations for a race discrimination claim brought under 42 U.S.C. § 1981. Alternatively, CBE has

---

[34] CBE's Appendix (docket number 17-4) at 74.

shown that there is no genuine dispute as to any material fact on Clay's race discrimination, hostile work environment, retaliation, and constructive discharge claims, and is therefore, entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Thus, CBE's motion for summary judgment is granted.

## VII.  ORDER

**IT IS THEREFORE ORDERED AS FOLLOWS**:

1.      The Motion for Summary Judgment (docket number 17) filed by Defendant Credit Bureau Enterprises, Inc. on March 16, 2012, is hereby **GRANTED**.

2.      The Complaint (docket number 2) filed by Plaintiff Rachel Clay on March 1, 2011, is hereby **DISMISSED**.

3.      The trial scheduled on June 25, 2012 and the final pretrial conference set for June 1, 2012 are hereby **CANCELLED**.

4.      All other pending motions are **DENIED** as moot.

DATED this 31st day of May, 2012.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA